IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **JOHN WILLIAMS** and **THELMA GARNER**, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 16 C 7043 |
| ) | |
| **THE RESERVES NETWORK, INC.**, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

This putative class action by John Williams ("Williams") and Thelma Garner ("Garner") against The Reserves Network, Inc. ("Reserves Network") was originally filed in the Circuit Court of Cook County's Chancery Division. Reserves Network has filed a Notice of Removal ("Notice") to bring the action to this District Court, purporting to invoke the diversity-of-citizenship branch of federal subject matter jurisdiction.

Because there is no reason to question the existence of the requisite diversity (see Notice ¶¶ 17-19) or the timeliness of removal (see Notice ¶ 10), this sua sponte memorandum opinion and order focuses on Reserves Network's contention that at least one of the named plaintiffs (and Reserves Network's counsel have understandably spoken in terms of Garner[1]) satisfies the required over-$75,000 amount in controversy. And for that purpose counsel refer to the Illinois Day and Temporary Labor Services Act (the "Act," 820 ILCS 175/1-175/99[2]), most particularly

---

[1] Williams was paid at a lower hourly rate than Garner, and he worked for Reserves Network for less than half of her 14-month tenure with that company.

[2] Further references to provisions of the Act will simply take the form "Act § --," omitting the prefatory 820 ILCS 175.

Act § 95, which provides a private right of action to any person "aggrieved by a violation of this Act."

In that respect Notice ¶ 20 (all case citations omitted) provides an accurate statement of the operative standards:

> For the amount in controversy requirement to be satisfied, a removing defendant need only show ". . . by a preponderance of the evidence that the case meets the $75,000.00 threshold." As a general rule, putative class members' individual damages cannot be aggregated to reach the required amount in controversy. The required amount in controversy is only met if at least one class representative has a claim that is worth more than $75,000, exclusive of interest and costs. In conducting this analysis, the Court considers the "amount required to satisfy the plaintiff's demands in full." Further, in the event of a removal, the amount in controversy is measured "on the day the suit was removed." This includes attorneys' fees.

But analysis reveals that Reserves Network's counsel have made a clearly flawed presentation on that score. Importantly, Notice ¶ 22 mentions -- but Reserves Network's counsel gloss over the impact of -- the allegations of Complaint ¶ 16 (emphasis added):

> During her employment with Defendant, Plaintiff Garner was sent home after having been contracted to work at Clearwater without receiving four hour minimum pay for that day <u>on several occasions</u>.

"Several occasions" is a term of imprecise content -- Webster's Third New International Dictionary defines it as "an indefinite number more than two and fewer than many." It is far more than reasonable to state with assurance that if plaintiffs' counsel had a basis for alleging (for example) something like "more than half the time" rather than the much weaker "several occasions," such a stronger assertion would have been made. That said, this Court will make the most favorable assumption for Reserves Network's purposes that on every occasion when Garner <u>was</u> sent home without receiving the statutorily required four-hour minimum pay, that took place before she had performed any services and therefore received nothing at all for that day.

Look then at what a maximum calculation of the amount in controversy would produce, even with the most plausibly conceivable inferences in Reserves Network's favor (however inappropriate in real world terms). Garner's hourly rate of $10.25 works out to $41 in a four-hour day. That figure, when multiplied by 210 days (representing fully 1/2 of the 14 months of her assignment to Reserves Network's third-party client company Clearwater[3]), amounts to $8,610. With an equal amount in liquidated damages (Act § 95(a)(1)), that brings the aggregate figure to $17,220. But at that point anyone who reads the Act through an unjaundiced eye[4] quickly sees that Reserve Network's counsel have left the analytical rails.

Notice ¶ 23 cites only Act § 95 in describing the "damages available under the [Act]," and it describes these asserted consequences of willful violations of the Act:

> In the case of a willful violation of any part of the Act, a person or entity is liable for penalties up to double the statutory amounts; additionally, if willful violations result in underpayments to workers, the person or entity is liable to the worker for 2% of the underpaid amounts for each month these amounts remain unpaid.

But that assertion is totally misleading, for the provision as to willful violations is found instead at Act § 75, which does describe the potential for double penalties <u>but</u> provides that "the penalty may be recovered in a civil action brought by the <u>Director</u> <u>of</u> <u>Labor</u> in any circuit court" (Act § 75(c)) and is <u>not</u> part of the private right of action spelled out in detail in Act § 95 -- and if there were any question on that score (as there is not), it would be dispelled by the contrast

---

[3] Because neither the Complaint nor the Notice describe Clearwater's business, the just-stated assumption in the text is based on a seven-day workweek, even though that is an extraordinary assumption for most businesses.

[4] See Alexander Pope's <u>Essay</u> <u>on</u> <u>Criticism</u> lines 558-59:

> All seems infected that th' infected spy,
> As all looks yellow to the jaundiced eye.

between the just-quoted Act § 75(c) and Act § 75(b), the latter of which provides in part that a willful violator "shall also be liable to the employee for punitive damages in the amount of 2% of the amount of any such underpayments for each month following the date of payment during which the underpayments remain unpaid."

Consequently the potential for that 2% monthly punitive damages award to Garner (an aggregate average of 14% of the earlier-referred-to damages figure of $17,220[5]) would add only a bit over $2,400 to the total. And as to the final potential ingredient of the amount in controversy, the item of attorneys' fees, the earlier-quoted language of Notice ¶ 20 has accurately stated that the amount in controversy is measured "on the day the suit was removed," a time at which the attorneys' fees to plaintiffs' counsel were necessarily modest. In sum, any contention that Reserves Network had "a good faith basis to believe that the amount in controversy exceeds $75,000.00" (Notice ¶ 24) is simply absurd.

It should be said again -- and really emphasized -- that all of the calculations that this opinion has run through -- and that Reserves Network's counsel should have made before attempting to bring this action into the federal system -- have provided Reserves Network with a grossly inadequate calculation in its favor regarding the amount in controversy as to either named plaintiff (obviously explaining why counsel for Garner and Williams have brought suit on behalf of a proposed class rather than purely individual claims). Indeed, Reserves Network's counsel really owe this Court an explanation of how they could have removed this

---

[5] That 14% number is based on the assumption that the unpaid amounts spanned Garner's 14-month employment term on a regular basis. But even if that were not the case, the added amount would still not approach twice the $2,400 figure given at the end of this sentence of the text.

action to the federal court in the subjective and objective good faith demanded by Fed. R. Civ. P. 11(b).

This Court determines that it is a major understatement to state, in the words of 28 U.S.C. § 1447(c), that "it appears that the district court lacks subject matter jurisdiction" -- and that being so, the same statute mandates that "the case shall be remanded." This Court accordingly orders the Clerk to mail a certified copy of the order of remand to the Clerk of the Circuit Court of Cook County forthwith so that the state court "may thereupon proceed with such case" (id.).

_____
Milton I. Shadur
Senior United States District Judge

Date: July 13, 2016